IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLES E. NASH,

               Plaintiff,

    vs.

MATANUSKA-SUSITNA
BOROUGH,

             Defendant.

Case No. 3:19-cv-00235-JMK

**ORDER GRANTING
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Before the Court at Docket 36 is Defendant Matanuska-Susitna Borough's ("the Borough") Motion for Summary Judgment. Plaintiff Charles Nash responded at Docket 41, to which the Borough replied at Docket 40. For the reasons set forth below, Defendant's Motion is GRANTED.

## I.  BACKGROUND

This dispute stems from a 1998 timber sale contract between the Borough and Mr. Nash. On September 25, 1998, the parties entered into a ten-year timber sale contract ("the First TSC") covering thousands of acres located in a remote area of the Chijuk Creek Forest Management Unit (the "Timber Sale Area").[1] The Timber Sale Area

---

[1] *See generally* Docket 36-14.

was inaccessible to foresters by developed road.[2]  Instead, abutting the Timber Sale Area was an undeveloped portion of Oilwell Road, a 100 foot-wide, public right of way spanning approximately fifteen miles.[3]

Mr. Nash and the Borough agreed on a logging plan of operations that would allow year-round harvest access to the Timber Sale Area.[4]  Under this plan, Mr. Nash would construct a ten-mile, all-weather road leading from the south end of the maintained portion of Oilwell Road to the Timber Sale Area.[5]  The road would include bridges over both Kroto Creek and Cottonwood Creek.[6]  As such, the First TSC provided that Mr. Nash bore responsibility "for acquiring legal access to the Contract Area" and "for maintaining any roads used for access to and within the Contract Area."[7]  This included obtaining any required permits.[8]  The First TSC did not convey to Mr. Nash any ownership interest in the Timber Sale Area.

Mr. Nash claims that at a "project kick-off meeting," a representative from the Anchorage District Corps of Engineers explained that a "Clean Water Act Section 404 permit" would be required for the road.[9]  The representative explained that Mr. Nash could

---

[2] Docket 31 at 5.  Foresters in the upper Susitna Valley had previously accessed timber sales using ice bridges and winter-only roads.  *See id.*; Docket 36-24 at 3.

[3] Docket 36-16 at 1.

[4] Docket 31 at 2; *see also* Docket 36-24 at 3; Docket 36-14 at 11 (requiring Mr. Nash to prepare a five-year conceptual operating plan, including road locations and stream crossings, and submit it to the Borough for review).

[5] Docket 31 at 2.

[6] *Id.* at 5.

[7] Docket 36-14 at 17; *see also* Docket 31 at 4.

[8] Docket 36-14 at 14; *see also* Docket 31 at 4.

[9] Docket 31 at 2.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                 Page 2

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 2 of 24

bypass the permitting process through the "Silvicultural Exemption."[10] Mr. Nash says the representative described this as a "narrowly defined exemption for a single purpose road . . . [that] may only be used for the purpose of constructing a road that accesses timber for management or harvest."[11] According to Mr. Nash, the representative clarified that "a road and related improvements like bridges, constructed under the authority of the Silvicultural Exemption, would not be a borough public road."[12] Mr. Nash claims that the road could not become a public road until the Borough received the more substantial "404 permit" from the Corps.[13] Mr. Nash says that he approached the Borough Public Works Director and asked him "if the Borough wanted to work with him to obtain a 404 permit for the road and bridges."[14] The Director responded, indicating that "the Borough was not interested and that [Mr. Nash] was on his own."[15] Mr. Nash claims that he then "informed the Corps of Engineers that he intended to construct the road and bridges under the Silvicultural Exemption provision of the Clean Water Act,"[16] which required the road to be constructed following the Best Management Practices of the Corps of Engineers to ensure the construction imposes a minimal impact on the surrounding waters or wetlands.[17]

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at 3.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at 6.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                 Page 3

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 3 of 24

Pursuant to the First TSC, Mr. Nash obtained all required permits for the project from the Borough.[18] The permits did not convey an ownership interest in any improvements Mr. Nash might make, and they expressly stated that developed roads within public rights of way or public easements were for public use.[19]

From 1999 to 2002, Mr. Nash built ten miles of road to access the Timber Sale Area.[20] He designed, planned, permitted, and constructed a developed road from Mile 6 of the existing Oilwell Road to the north boundary of the Timber Sale Area at Mile 16.[21] As part of the road, Mr. Nash constructed two bridges: a 40-foot, single span bridge across Cottonwood Creek and a 180-foot, three-span bridge across Kroto Creek.[22] Mr. Nash also constructed the appropriate approaches to the existing Moose Creek bridge so that it was usable for highway vehicles.[23] He used his own funds for the project and did not receive any funding from the Borough.[24]

On October 24, 2002, the Borough terminated the First TSC. The events leading up to the termination are described in detail by the Alaska Supreme Court in *Nash v. Matanuska-Susitna Borough*.[25] In part, Mr. Nash failed to meet harvest level

---

[18] *Id.* at 5; *see generally* Docket 36-15 (general construction permit for Kroto Creek bridge); Docket 36-16 (general construction permit for Oilwell Road right of way).

[19] *See* Docket 36-15 at 1–2; Docket 36-16 at 2.

[20] *See* Docket 31 at 5; Docket 36 at 2 (the Borough does not dispute that Mr. Nash developed a portion of Oilwell Road and participated in placing a bridge at Cottonwood Creek and Kroto Creek).

[21] Docket 31 at 5.

[22] *See id.*; Docket 36 at 2–3. Mr. Nash testified that the two bridges were considered part of Oilwell Road. *See* Docket 36-19 at 5–6.

[23] Docket 31 at 5.

[24] *Id.* at 5–6; Docket 36-14 at 17 (requiring Mr. Nash to obtain access to the Timber Sale Area and maintain roads).

[25] 239 P.3d 692, 694–96 (Alaska 2010).

*Nash v. Matanuska-Susitna Borough*
Order Granting Defendant's Motion for Summary Judgment
Case No. 3:19-cv-00235-JMK
Page 4

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 4 of 24

requirements and failed to appropriately remove downed logs per his obligations under the First TSC.[26] The Borough informed Mr. Nash that he was no longer authorized to enter the property, and it removed some of Mr. Nash's equipment.[27] Accordingly, Mr. Nash ceased nearly all maintenance on the roads.[28]

On March 10, 2003, Mr. Nash—represented by counsel—sued the Borough in Alaska Superior Court, alleging, among other claims, breach of contract for terminating the First TSC.[29] Specifically, Mr. Nash cited "loss of capital investments" due to the breach, namely, the loss of his investment in the road and two bridges.[30] Mr. Nash offered to settle his claim in a July 12, 2007 letter, in which he proposed that the Borough pay him "for the value of the road improvements."[31] The Borough was unwilling to settle the lawsuit by paying Mr. Nash damages; rather, it was interested in "exploring some form of specific performance by entering into a new contract" with Mr. Nash to continue to harvest the timber.[32] The parties did not reach settlement at that time. On February 25, 2008, the Superior Court upheld the termination, and on March 25, 2008, Mr. Nash appealed to the Supreme Court, which ultimately remanded the case for a trial *de novo*.[33] With Mr. Nash

---

[26] *Id.* at 698.

[27] *Id.* at 695–96.

[28] *See* Docket 36-30 at 5. Mr. Nash testified that in early 2003 he "maybe" put a guardrail put on Kroto Creek bridge.

[29] *See Nash v. Matanuska-Susitna Borough*, 239 P.3d 692, 697 (Alaska 2010). Mr. Nash first challenged the termination by filing an administrative appeal to the local Board of Adjustment and Appeals, which upheld the termination.

[30] *See* Docket 36-24 at 10–11; 239 P.3d at 694 (explaining that Mr. Nash "claims that his construction of 11 miles of all-weather road made up the largest part of his $1.5 million investment in the Chijuk timber project" for which he sought to recover damages).

[31] Docket 36-26 at 1.

[32] Docket 36-27 at 1.

[33] 239 P.3d 692 at 701.

*Nash v. Matanuska-Susitna Borough*                                      Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                    Page 5

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 5 of 24

still represented by counsel, the parties re-entered settlement negotiations, resulting in the Settlement Agreement and Release of All Claims ("Settlement Agreement"), a Release of Liens and Indemnification Agreement ("Lien Release"), and the execution of the Second Timber Sale Contract ("Second TSC").

The Settlement Agreement, executed by both parties in February 2013, includes a mutual release and an agreement to enter into the Lien Release.[34] Pursuant to the Settlement Agreement, Mr. Nash released any damages, claims and future actions against the Borough "which arise from, relate to, or are, in any way, connected to the circumstances recited above relating to the original 1998 Timber Sale Contract," and agreed to waive any further payments from the Borough that "relate to the original 1998 Timber Sale Contract."[35] Pursuant to the Lien Release, Mr. Nash released any liens or claims that had been recorded on the real property in the Timber Sale Area, including a 2005 lien that Mr. Nash had filed on "all the roads and sale improvements" related to the First TSC.[36] In exchange for these releases, the Borough agreed to execute the Second TSC.[37]

During the above litigation regarding the First TSC (the "First TSC Litigation"), the Borough contracted with third parties in 2009 and 2010 to repair the Kroto

---

[34] Docket 36-53 at 2.
[35] *Id.*
[36] Docket 36-54 at 2, 10.
[37] Docket 36-53 at 2.

Creek bridge[38] and replace the Cottonwood Creek bridge,[39] respectively. In 2015, the Borough again contracted with a third party to replace the Kroto Creek bridge.[40]

The Second TSC provided that Mr. Nash had five years to harvest the Timber Sale Area but, unlike the First TSC, he was no longer required to harvest a certain number of acres per year.[41] As in the First TSC, the Second TSC did not convey any ownership interest in Oilwell Road to Mr. Nash.[42] By its terms, the Second TSC was set to terminate on April 15, 2018.[43]

Mr. Nash was unable to harvest any timber before the scheduled termination of the Second TSC.[44] Mr. Nash approached the Borough and requested an extension to allow more time to harvest.[45] Rather than extend the Second TSC, the Borough and Mr. Nash allowed the Second TSC to expire and then entered into a Third Timber Sale Contract ("Third TSC").[46] The Third TSC explains that the Second TSC had expired without extension and that "the Borough met its obligations to Mr. Nash under the settlement agreement for the above-referenced lawsuit," referring to the First TSC

---

[38] *See generally* Dockets 36-31; 36-32; 36-33.
[39] *See generally* Dockets 36-34; 36-35; 36-36.
[40] *See generally* Docket 36-59.
[41] *See* Docket 36-55 at 7.
[42] *See generally* Docket 36-55.
[43] Docket 36-55 at 7. The Second TSC was actually terminated on April 22, 2018. *See* Docket 36-66.
[44] *See* Docket 36-67 at 6.
[45] *Id.*; *see also* Docket 36-11 at 2.
[46] *See* Docket 36-67 at 6.

*Nash v. Matanuska-Susitna Borough*                                     Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                  Page 7

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 7 of 24

Litigation.[47]   The terms of the Third TSC largely mirrored those of the Second TSC.   The

Third TSC was terminated on February 5, 2019.[48]

On August 29, 2019, Mr. Nash, representing himself, filed a "Complaint for

a Constitutional Taking" against Defendant Matanuska-Susitna Borough in this Court.[49]

Mr. Nash alleges that in 2015, the Borough "removed and destroyed Plaintiff's property,"

namely, the Kroto Creek bridge and the Cottonwood Creek bridge that he constructed to

access the Timber Sale Area under the terms of the First TSC.[50]   Mr. Nash states that he

built the improvements "using his own financial resources and with full knowledge and

permission of the Borough,"[51] that he owns these improvements, and that the Borough's

construction on these improvements amount to a Taking under the United States

Constitution and the Alaska Constitution.[52]

Mr. Nash filed his own Motion for Partial Summary Judgment on July 27,

2021,[53] which the Court denied on September 24, 2021.[54]   The Borough now moves for

summary judgment on Mr. Nash's claims.

---

[47] *Id.*

[48] Docket 36-11 at 3.

[49] Docket 1.

[50] *Id.* at 5.

[51] *Id.* at 4.

[52] *Id.* at 5.

[53] Docket 30.  While this was titled a "partial" motion for summary judgment, Mr. Nash appeared to ask the Court for a summary ruling for all claims.

[54] Docket 37.  Ordinarily, this Court would resolve the competing Motions for Summary Judgement simultaneously in one comprehensive order.  However, considering Mr. Nash's *pro se* status, the Court issued its denial of Mr. Nash's Motion for Partial Summary Judgment to give Mr. Nash the benefit of its contents for responding to the Borough's pending motion, specifically, instructing him that he must "support any factual allegations by attaching documents, declarations, photos, et cetera, or by citing to other specific materials already in the record." *Id.* at 5.

*Nash v. Matanuska-Susitna Borough*                                        Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                        Page 8

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 8 of 24

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[55]  The term "material fact" refers to any facts that might affect the outcome of the case.[56]  Ultimately, a genuine dispute of material fact exists if there is sufficient evidence that a jury could return a verdict for the nonmoving party.[57]  As such, "where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."[58]  However, when the nonmoving party will carry the burden of proof, the movant may simply show that the nonmoving party lacks sufficient evidence to support its case.[59]

The party moving for summary judgment has the initial burden of establishing that no genuine issue of material fact exists.[60]  If the moving party satisfies this initial burden, then the non-moving party must present specific evidence showing a genuine issue of material fact.[61]  When evaluating a motion for summary judgment, the court will view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.[62]  However, the nonmoving party cannot rely upon conclusory allegations or denials to create a triable issue; it must set forth

---

[55]  Fed. R. Civ. P. 56(a).
[56]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[57]  *Id.*
[58]  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)).
[59]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[60]  *Id.*
[61]  *Anderson*, 477 U.S. at 248–49.
[62]  *Rookaird*, 908 F.3d at 459.

*Nash v. Matanuska-Susitna Borough*                                   Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                Page 9

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 9 of 24

specific facts that "require a jury or judge resolve the parties' differing versions of the truth at trial."[63]

## III. DISCUSSION

Mr. Nash claims that, in 2015, the Borough "removed and destroyed" the two bridges in violation of the Takings Clauses of the Fifth and Fourteenth Amendment of the United States Constitution and Article I and Article VIII of the Alaska Constitution.[64] For relief, he seeks the "fair market value" of the bridges at the time of the taking, with interest.[65]

In defense, the Borough argues that (1) Mr. Nash's taking claim is barred by the Settlement Agreement and the Lien Release; (2) Mr. Nash did not have a property interest in either bridge in 2015; and (3) Mr. Nash's claim is contractual in nature and thus barred by the three-year statute of limitations.[66]

The Court agrees with the Borough that Mr. Nash did not have a property interest in the two bridges in 2015 and that, even if he had, his claim is barred by the Settlement Agreement and Lien Release. As such, his taking claim fails under both the United States Constitution and the Alaska Constitution.

---

[63] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987) (quotation and citation omitted).

[64] Docket 1 at 5. Although Mr. Nash's Complaint identifies the 2015 removal as the Constitutional taking at issue, he refers to the Borough asserting control over the road and bridges in 2003 in his opposition, his "Preliminary Statement and Facts Giving Rise to Claims," and in his own Motion for Partial Summary Judgment. *See* Docket 41 at 1; Docket 1 at 3; Docket 31 at 6. The Court interprets Mr. Nash's Complaint as specifically alleging the 2015 removal as the "taking" under which he brings his claim, however, as discussed below, whether the alleged taking occurred in 2003 or 2015 is irrelevant to the Court's analysis and conclusion.

[65] Docket 1 at 6.

[66] *See generally* Docket 36.

*Nash v. Matanuska-Susitna Borough*                                     Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                              Page 10

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 10 of 24

**A.      There Are No Genuine Issues of Material Fact, and a Summary Judgment Ruling is Appropriate**

As a threshold matter, the Court finds that a summary judgment ruling is appropriate in this case.  In determining whether to grant or deny summary judgment, a court need not "scour the record in search of a genuine issue of triable fact."[67]  A court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."[68]  In his opposition, Mr. Nash asserts that there are "numerous disputable facts," but fails to identify those facts or establish why they are material.[69]  At most, Mr. Nash claims that the "status of the road" is uncertain because he asserts an ownership interest in the road and bridges, and the Borough denies any such interest.[70]  Mr. Nash provides no citations to materials in the record and does not allege any specific facts that would demonstrate the "uncertain" status of the road.  There simply is no evidence in the record to suggest a genuine factual dispute concerning the status of Oilwell Road other than Mr. Nash's unsupported assertions.

Mr. Nash previously moved for summary judgment, stating, without supporting evidence, that there were no genuine issues of material fact in this dispute.[71]  Following the Court's denial of Mr. Nash's Motion,[72] Mr. Nash opposed the Borough's

---

[67] *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation and citation omitted).

[68] *Id.* (internal quotation and citation omitted).

[69] Docket 41 at 2.

[70] *Id.* at 1.

[71] Docket 31 at 8.  While his motion was for "partial" summary judgment, Mr. Nash's memorandum requested a summary ruling on the entirety of his claim.

[72] Docket 37.

*Nash v. Matanuska-Susitna Borough*                                         Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                   Page 11

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 11 of 24

Motion for Summary Judgment asserting that there *are* genuine issue of material fact.[73] However, despite the Court's previous specific instructions to Mr. Nash to "support any factual allegations by attaching documents, declarations, photos, et cetera, or by citing to other specific materials already in the record,"[74] Mr. Nash failed to do so in his opposition. The Court finds it difficult to reconcile these conflicting positions, particularly as both are unsupported by evidence in the record. Mr. Nash cannot rely upon conclusory allegations or denials to create a triable issue; he must set forth specific facts that "require a jury or judge resolve the parties' differing versions of the truth at trial."[75] Because the Court does not find any specific facts in the record that are disputed, let alone that might affect the outcome of this case, summary judgment is appropriate here.

**B.    Mr. Nash's Claim is Barred by the Settlement Agreement and Lien Release**

Mr. Nash's taking claim is barred by the plain language of the Settlement Agreement and the related Lien Release. "A settlement agreement is subject to ordinary local rules of contract construction and interpretation."[76] As such, this Court will apply Alaska state law to construe the terms of the Settlement Agreement and Lien Release. Under Alaska law, a court interpreting a contract attempts to enforce the reasonable

---

[73] Docket 41 at 2.

[74] Docket 37 at 5.

[75] *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987).

[76] *Tarabochia v. Clatsop Cnty. Oregon,* 646 Fed. Appx. 535, 538 (9th Cir. 2016) (citing *Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir. 1989) (subsequent citations omitted)); *see also Alyeska Pipeline Serv. Co. v. Shook,* 978 P.2d 86, 89 (Alaska 1999) (interpreting release and indemnity agreement under principals of contract law).

*Nash v. Matanuska-Susitna Borough*                                        Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                  Page 12

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 12 of 24

expectations of the parties by analyzing the language used in the contract and the relevant extrinsic evidence of the parties' intentions.[77]

**(1)   The present claim is related to the First TSC Litigation and therefore barred by the Settlement Agreement**

The plain language of the Settlement Agreement expressly bars Mr. Nash's claim.  Under the mutual release, Mr. Nash "releases and forever discharges" the Borough

> from any and all actions, causes of action, suits, controversies, demands, obligations, rights, costs, contribution, indemnity, claims and damages of every kind and nature which arise from, relate to, or are, in any way, connected to the circumstances recited above relating to the original 1998 Timber Sale Contract.[78]

The Settlement Agreement did not provide for any reservation of claims.  This language unambiguously bars any claim related to the two bridges that Mr. Nash constructed to access the Timber Sale Area under the First TSC.

Mr. Nash testified that the road and both bridges were built to access the Timber Sale Area under the First TSC, which had specified that Mr. Nash was responsible for creating means of access to the site.[79]  In the First TSC Litigation, Mr. Nash specifically sought recovery for the "loss of capital investments" in the project, namely, his costs to construct the road improvements and bridges spanning Cottonwood Creek and Kroto Creek.[80]  Ultimately, the cost to construct the road and bridges was incorporated into the

---

[77] *Chambers v. Scofield*, 247 P.3d 982, 987 (Alaska 2011) (citing *Smith v. Cleary*, 24 P.3d 1245, 1249 (Alaska 2001)).

[78] Docket 36-53 at 2.

[79] *See* Docket 36-18 at 5; Docket 36-14 at 17.

[80] Docket 36-24 at 10–11 (alleging loss of capital investments); *see also id.* at 3–4 (describing the capital investments in Kroto Creek and Cottonwood Creek bridge).

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                 Page 13

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 13 of 24

reduced timber purchase price under the Second TSC, which was executed pursuant to the Settlement Agreement.[81]  In the present lawsuit, Mr. Nash seeks to recover his total cost of building Cottonwood Creek and Kroto Creek bridges, which, per Mr. Nash's testimony, is the same as his "capital investment" in those bridges.[82]  Thus, the relief requested in the First TSC Litigation, which was dismissed pursuant to the Settlement Agreement, is nearly identical to the relief he currently seeks.

In sum, looking at both the plain language of the Settlement Agreement and evidence of the parties' intent, Mr. Nash's claims regarding the Cottonwood Creek and Kroto Creek bridges are unambiguously related to the First TSC and thus barred.  Mr. Nash constructed the bridges in order to perform the First TSC.  The value of the bridges was central to the First TSC Litigation:  the loss of his capital investment was included in Mr. Nash's prayer for relief, the cost of the bridges was key to the settlement negotiations, and that cost was incorporated into the timber price under the Second TSC, which was then executed as consideration for the Settlement Agreement.  This Court cannot imagine any theory in which Mr. Nash's current claim is *not* related to the First TSC within the meaning of the Settlement Agreement.  The fact that Mr. Nash now requests relief under a constitutional theory rather than a contractual theory does not change this result—the

---

[81] *See* Docket 36-4 at 3–5; Docket 36-43 at 2 (including costs to construct sixteen miles of road and creek crossings in expert appraisal report); Docket 36-44 at 26, 28 (including costs to construct road and bridges in expert appraisal report); Docket 36-45 at 6 (including costs to construct all-weather road plus maintenance in expert appraisal report).

[82] Docket 36-70 at 5–6.

*Nash v. Matanuska-Susitna Borough*                                                     Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                   Page 14

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 14 of 24

Settlement Agreement's broad release bars claims of "any kind and nature" that are "in any way connected with" the First TSC.[83]

The Court notes that Mr. Nash's briefing is inconsistent on whether the alleged taking took place in 2003 (when the Borough first assumed maintenance over the road and bridges after terminating the First TSC) or in 2015 (when the Borough removed and replaced Kroto Creek bridge).[84] If the alleged taking took place in 2003, then he would have released the claim when he signed the Settlement Agreement in 2013, which discharged all claims relating to the First TSC.[85] If the alleged taking took place in 2015, his claim is still barred pursuant to the Settlement Agreement's "Covenant Against Further Action," and "Scope of Matters Released" provisions, discussed below.

### (2) The present litigation falls within the Settlement Agreement's "Covenant Against Further Actions"

The Settlement Agreement bars Mr. Nash's claim regardless of when that claim accrued. The Settlement Agreement includes a "Covenant Against Further Action" in which the parties agreed to not bring "any further action" that was "specifically released by this agreement for damages or compensation of any kind" including those "accrued, accruing or later to accrue . . . and relating to, or in any way connected with, the claims

---

[83] Docket 36-53 at 2.

[84] Mr. Nash's Complaint only appears to include a claim for an alleged taking in 2015. Docket 1 at 4–5. However, Mr. Nash's opposition claims that the taking occurred in 2003. Docket 41 at 1; *see also* Docket 1 at 3 (stating in Complaint's "Preliminary Statement and Facts Giving Rise to Claims" that the Borough "commandeered" the road and bridges in 2003); Docket 31 at 6 (stating in Plaintiff's Partial Motion for Summary Judgment that Defendant "commandeered" the road and bridges in 2003). The Court interprets Mr. Nash's Complaint as specifically alleging the 2015 removal as the "taking" under which he brings his claim, however, whether the alleged taking occurred in 2003 or 2015 is irrelevant to the Court's conclusion.

[85] *See* Docket 36-53 at 2.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                          Page 15
Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 15 of 24

settled or released by this Agreement."[86]   Mr. Nash additionally waived "all rights to receive any further payments" from the Borough that "relate to the original 1998 Timber Sale Contract."[87]   Finally, the "Scope of Matters Released" provision of the Settlement Agreement provides that the consideration exchanged is a "complete and final release" from "whatever claims, known or unknown, which may now or in the future result from the claims settled by this Agreement, the matter released."[88]

The Alaska Supreme Court has explained that "settlement agreements that waive future liability will be upheld subject to certain limits, and in any event they will be strictly construed."[89]   A future claim is barred by a settlement agreement when it is "reasonably ascertainable that the objectionable conduct" would continue after the settlement agreement.[90]   Here, the allegedly "objectionable conduct"—*i.e.*, the Borough interfering with the road and bridges—was clearly contemplated by the Settlement Agreement and nearly certain to continue after 2013.   Assuming the alleged taking occurred in 2015, this was not the first time the Borough had assumed ownership of the bridges.   Indeed, Mr. Nash states in his Complaint that the Borough had "assert[ed] control over all aspects of the road" the bridges in 2003.[91]   The Borough also contracted with third parties to repair the Kroto Creek bridge in 2009[92] and to replace the Cottonwood Creek

---

[86]   *Id.* at 3.
[87]   *Id.* at 2.
[88]   *Id.* at 4.
[89]   *Alleva v. Mun. of Anchorage*, 467 P.3d 1083, 1090 (Alaska 2020).
[90]   *Id.*
[91]   Docket 1 at 3.
[92]   *See generally* Dockets 36-31; 36-32; 36-33.

*Nash v. Matanuska-Susitna Borough*                                                Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                          Page 16

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 16 of 24

bridge in 2010.[93]  The Second TSC includes a provision that Mr. Nash inspected the site and "ascertain[ed] the general and local conditions, which could affect the contract, the duration of it or the costs associated thereof."[94]  Mr. Nash undoubtedly understood the Borough had been performing maintenance on the bridges and would continue to perform maintenance on the bridges, and that the Borough considered the bridges to be public property.[95]  The provisions of the Settlement Agreement that waive future liability are therefore validly applied to Mr. Nash's claim that the Borough "removed and destroyed" the bridges in 2015.[96]

### (3)    Mr. Nash's claim is separately barred by the Lien Release

In addition to the bar imposed by the Settlement Agreement, Mr. Nash's claim is also barred by the Lien Release.  On December 10, 2021, Mr. Nash filed a claim of lien upon the Timber Sale Area, including "all roads and improvements."[97]  Pursuant to the Lien Release, he released "any claim" he might have had against the real property, both in the Timber Sale Area and as described in the December 10 real estate lien.[98]  Mr. Nash agreed that there were no amounts due for "work, labor, services performed on, or for materials supplied to, or timber removed from, or anything else" for which he or any person

---

[93]  *See generally* Dockets 36-34; 36-35; 36-36.
[94]  Docket 36-55 at 7; *see also* Docket 36-52 at 6–8 (Mr. Nash testifying that he inspected the bridges in late 2012).
[95]  *See Alleva v. Mun. of Anchorage*, 467 P.3d 1083, 1091 (Alaska 2020) (finding that settlement agreement barred future lawsuit because alleged conduct was of a similar nature to the conduct previously released under the agreement); Docket 1 at 3 (stating in "Preliminary Statement and Facts Giving Rise to Claims" that the Borough assumed control of the road and bridges in 2003).
[96]  *See* Docket 1 at 5.
[97]  Docket 36-54 at 10.
[98]  *Id*. at 2.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                              Page 17

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 17 of 24

could pursue a lien on the property.[99]  This would include the roads and bridges at issue in this lawsuit.

**(4)    Mr. Nash does not challenge that his claim is barred by the Settlement Agreement or Lien Release**

Mr. Nash has not offered any cognizable explanation for how his claim is not barred under the Settlement Agreement and the Lien Release.  His opposition simply states that the Borough's arguments "completely miss the point of this lawsuit" and summarily reiterates that the Borough unlawfully seized his property when it "commandeered" the road and bridges.[100]  He does not assert that the Settlement Agreement is unconscionable or otherwise unenforceable.  To wit, Mr. Nash was represented by counsel during negotiations, and he does not offer evidence that the Settlement Agreement was executed in bad faith.  The Settlement Agreement shows adequate consideration, and its terms are reasonable.  More fundamentally, Mr. Nash does not assert that the bridges are unrelated to the First TSC or the First TSC Litigation, and he does argue that his claim is outside the scope of the Settlement Agreement or Lien Release.

Even assuming, *arguendo*, that the bridges were Mr. Nash's property and that the Borough destroyed that property in either 2003 or 2015, Mr. Nash released that claim under the Settlement Agreement and Lien Release.  To allow this lawsuit to proceed would permit Mr. Nash to reap the benefits of the settlement without being bound to its terms.

---

[99]  *Id.*
[100]  Docket 41 at 1.

*Nash v. Matanuska-Susitna Borough*                                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                                    Page 18

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 18 of 24

**C.  Mr. Nash's Claim also Fails Because the Bridges and Road Were Not His Property at the Time of the Alleged Taking**

Although the status of the bridges at the time of the alleged taking is irrelevant to whether Mr. Nash's claim is barred by the Settlement Agreement, the Court addresses this issue given Mr. Nash's position that the Borough's briefing on the Settlement Agreement "miss[es] the point of this lawsuit."[101]  Even if the Settlement Agreement did not bar the present lawsuit, Mr. Nash's takings claim fails under both the United States and the Alaska Constitution because he does not and did not at any time have a property interest in the road and bridges.

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides:  "[N]or shall private property be taken for public use, without just compensation."  The Government commits a physical taking when it occupies or takes possession of property without acquiring title to it; in these cases, the Government must "pay for what it takes."[102]  Similarly, under the Alaska Constitution, "[p]rivate property shall not be taken or damaged for public use without just compensation" and "[n]o person shall be involuntarily divested of . . . his interest in lands, or improvements affecting" that interest without just compensation and by operation of law.[103]  By definition, for a taking to occur, Mr. Nash would have to have had an ownership interest in the road and bridges when the Government seized the property.[104]  The terms of

---

[101]  *Id.*
[102]  *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).
[103]  *See* Alaska Const. Art I, § 18; Alaska Const. Art VIII, § 16.
[104]  *See, e.g., Cedar Point Nursery*, 141 S. Ct. at 2071–72.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                          Page 19

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 19 of 24

the First TSC, the permits Mr. Nash acquired to fulfill his obligations under the First TSC, and the parties' actions after the TSC was executed collectively demonstrate that no taking occurred because Mr. Nash never had an ownership interest in the road and bridges leading to the Timber Sale Area.

Under the terms of the First TSC, it was understood that the roads and bridges leading to the Timber Sale Area were public property, not Mr. Nash's private property. The parties agree that Mr. Nash constructed the road improvements and bridges, and that he funded the project.[105] However, his investment in the construction did not transform the road or the bridges into his property. The First TSC did not grant Mr. Nash any property interest beyond his right to harvest timber in the Timber Sale Area.[106] The First TSC also prohibited Mr. Nash from installing barriers on the roads and bridges that restricted public access to the Timber Sale Area.[107]

Indeed, the First TSC provided that Mr. Nash would be responsible "for acquiring legal access to the [Timber Sale Area]" and "for maintaining any roads used for access to and within the [Timber Sale Area]," including obtaining any required permits.[108] The permits that Mr. Nash received to build the road and bridges were issued from the Public Works Department of the Borough.[109] Mr. Nash needed these permits to perform

---

[105] *See* Docket 36 at 2.
[106] *See generally* Docket 36-14.
[107] *Id.* at 17. Mr. Nash could restrict access with written permission from the Borough or as specified in the approved operating plan.
[108] *Id.*
[109] *See* Dockets 36-15; 36-16.

*Nash v. Matanuska-Susitna Borough*                                                                 Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                Page 20

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 20 of 24

construction on Oilwell Road because it was a public right of way.[110]  He received a permit to construct "[i]mprovements within Oilwell Road right-of-way for the construction of a single lane road with pullouts,"[111] which included a crossing over Cottonwood Creek.[112] That permit required Mr. Nash to "construct [the] road within right-of-way and/or within existing road prism."[113]  Mr. Nash received a separate permit to construct "a Bridge over Kroto Creek and earth abutments for Bridge" within the Oilwell Road public right of way.[114]  These permits show that Oilwell Road, while unimproved, was a public right of way when Mr. Nash entered into the First TSC and, accordingly, the bridges on Oilwell Road were part of that public right of way and for public use.

The parties' actions following the termination of the First TSC also indicate that Mr. Nash lacked a property interest in the bridges.  Before the parties settled the First TSC Litigation, Mr. Nash had placed a lien on the bridges and road improvements, from which the Borough specifically sought relief via the Lien Release.[115]  Neither the Second nor Third TSCs—both executed after Mr. Nash sued the Borough for the value of the road and bridges—granted a property interest to Mr. Nash beyond the right to harvest timber.[116] Instead, the Second TSC, which was in effect at the time of the alleged taking, again made

---

[110]  *See* Docket 36-14 at 14 (describing required permits from the Borough Public Works Department for construction on Borough-maintained road or right of way); *see also* Docket 36-15 at 1 (authorizing construction in public right of way); Docket 36-16 at 1 (authorizing construction in public right of way).

[111]  Docket 36-16 at 1.

[112]  *Id.* at 2.

[113]  *Id.*

[114]  Docket 36-15 at 1.

[115]  Docket 36-54 at 2.

[116]  *See generally* Docket 36-55 (Second TSC); Docket 36-67 (Third TSC).

*Nash v. Matanuska-Susitna Borough*                                                   Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                           Page 21

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 21 of 24

Mr. Nash responsible for acquiring legal access to the sale area and maintaining active roads.[117] The Second TSC did not mention the existing Cottonwood Creek bridge or Kroto Creek bridge, but it included a clause that Mr. Nash had inspected the area and was aware of the conditions of the road.[118] The cost of the bridges was contemplated in the reduced timber price under the Second TSC, which would be illogical had the parties understood them to be Mr. Nash's property.[119] Last, as discussed above, the Borough had maintained the bridges since 2003, including a significant upgrade to Kroto Creek bridge in 2010.[120]

Overall, the evidence shows that Mr. Nash improved the public road and right of way in exchange for, and as required to, harvest the Timber Sale Area under the First TSC. In executing the First TSC, the Borough did not convey those public roads or bridges to Mr. Nash.

Interpreting Mr. Nash's various filings in concert, the Court tenuously understands his position to be that the road and bridges cannot be public property because he constructed them under the "Silvicultural Exemption" of the Clean Water Act, which can only apply to roads used for silviculture activities.[121] Mr. Nash claims that the road is not a public road because the Borough never received a Clean Water Act "Section 404 Permit" from the Corps.[122] Even assuming the Borough violated the Clean Water Act by

---

[117] Docket 36-55 at 18.
[118] *Id.* at 7.
[119] *See* Docket 36-4 at 3–5; Docket 36-43 at 2 (including costs to construct sixteen miles of road and creek crossings in expert appraisal report); Docket 36-44 at 26, 28 (including costs to construct road and bridges in expert appraisal report); Docket 36-45 at 6 (including costs to construct all-weather road plus maintenance in expert appraisal report).
[120] *See generally* Dockets 36-31; 36-32; 36-33.
[121] Docket 31 at 2.
[122] *Id.* at 3.

*Nash v. Matanuska-Susitna Borough*                                          Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                    Page 22

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 22 of 24

treating the road improvement and bridges as a public road, this does not transform that road into Mr. Nash's property. In other words, the Clean Water Act governs usage and contemplates environmental impacts, as such, it would only serve to impact or limit the Borough's enjoyment of these roads.[123] Its regulations would neither implicate the actual property rights nor suggest that Mr. Nash owned the road.

Mr. Nash has not provided any evidence to suggest that the bridges were his property in 2003 or 2015. The record before the Court unambiguously shows the opposite is true. Mr. Nash has not met his burden to set forth specific facts and evidence that show a genuine dispute of material fact regarding the bridge's ownership, and the Court concludes that he did not have a property interest in the bridges. Therefore, the Borough's repair of the bridges cannot constitute a taking under either the United States or the Alaska Constitution.

**D.    The Court does Not Consider Mr. Nash's briefing on the Clean Water Act, Fraud, or an Exaction Taking**

Mr. Nash's Complaint only alleges a claim that the Borough destroyed his property in violation of the Takings Clauses of the United States Constitution and Article I and Article VIII of the Alaska Constitution.[124] However, Mr. Nash alludes to various other claims throughout his filings. His Complaint's "Preliminary Statement and Facts Giving Rise to Claims" and his Motion for Partial Summary Judgment include references to the Clean Water Act, common law fraud claims, and an exaction taking.[125] Most specifically,

---

[123]   *See generally* The Clean Water Act, 33 U.S.C. 1251, *et seq.*
[124]   Docket 1 at 5.
[125]   *See* Docket 1 at 2–3, Docket 31 at 6–9.

*Nash v. Matanuska-Susitna Borough*                                    Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                          Page 23

Case 3:19-cv-00235-JMK    Document 42    Filed 04/19/22    Page 23 of 24

in his Motion for Partial Summary Judgment, Mr. Nash alleges that in 2018, "Defendant blackmailed the Plaintiff into making more than $25,000 of road upgrades to the road that he had constructed, under the Silvicultural Exemption provision, as the quid pro quo for obtaining the Timber Transport Permit."[126]

While Mr. Nash references these violations, his Complaint only includes the specific allegation that the Borough committed a taking in 2015 by removing his "property," namely the bridges leading to the Timber Sale Area.[127] Mr. Nash's Complaint does not discernibly plead violations of the Clean Water Act, fraud, or an exaction taking that occurred in 2018. Mr. Nash cannot bring claims against the Borough that do not properly exist in his Complaint. If Mr. Nash desires to bring these additional claims against the Borough, he must do so properly by specifically pleading them in a separate complaint.

## IV. CONCLUSION

For the above reasons, the Borough's Motion for Summary Judgment is GRANTED, and Mr. Nash's case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 19th day of April, 2022, at Anchorage, Alaska.

_/s/ Joshua M. Kindred_
JOSHUA M. KINDRED
United States District Judge

---

[126] Docket 31 at 4.
[127] Docket 1 at 4–5; *see also id*. at 6 (prayer for relief includes value of the property "at the time of the taking").

*Nash v. Matanuska-Susitna Borough*                                   Case No. 3:19-cv-00235-JMK
Order Granting Defendant's Motion for Summary Judgment                                   Page 24

Case 3:19-cv-00235-JMK   Document 42   Filed 04/19/22   Page 24 of 24